**FIRST STATE BANK OF ATHENS, MABANK BRANCH, Appellant,**

v.

**PURINA AG CAPITOL CORPORA-TION, and Purina Mills, Inc. d/b/a Purina Cattle Management and Van Zandt Livestock, Inc., Appellees.**

No. 12–99–00062–CV.

Court of Appeals of Texas, Tyler.

Oct. 28, 1999.

M. Keith Dollahite, Tyler, for appellant.

Steven C. Haley, Brenham, for Appellee Purina.

Mark J. Calabria, Kaufman, for Appellee Van Zandt Livestock.

Panel consisted of RAMEY, Jr., C.J., HADDEN, J., and WORTHEN, J.

HADDEN, Justice.

This case involves a dispute between two competing lien creditors over proceeds from the sale of 818 head of cattle. One of the competing creditors, Purina Ag Capital Corp. and Purina Mills, Inc. d/b/a Purina Cattle Management Services (collectively "Purina"), filed a motion for summary judgment on the entire dispute between it and the other creditor, First State Bank of Athens, Mabank Branch ("Bank"), which the trial court granted. In five issues presented, the Bank appeals the trial court's ruling. We will reverse and remand.

**I.**

Procedural and Factual Background

On December 11, 1996, the Bank made a secured loan to James and Kelly Grisham d/b/a J & K Cattle ("Grishams"), who signed a promissory note to the Bank for $720,322.00. To secure this note, the Grishams granted the Bank a security interest in certain collateral, including "all cattle now owned [by the Grishams] or hereafter acquired, any increase, or the products or proceeds thereof, including but not limited to: 1565 cows, 1000 calves and 42 bulls." In the loan documents, the Grishams agreed to refrain from selling the cattle unless they received written permission to do so from the Bank. The loan documents also contained a provision stating that:

It is agreed and understood that any and all proceeds from the sale of any and all livestock and increases thereof pledged as collateral will be promptly forwarded to [the Bank], to be applied to [the Grishams'] indebtedness.

The Bank filed financing statements to perfect its security interests in the cattle.

On December 20, 1997, Appellee Van Zandt Livestock, Inc. ("Van Zandt") executed a promissory note to Purina in the amount of $552,000.00. Van Zandt is a Texas corporation that owns and operates a livestock commission sales barn. James and Kelly Grisham are its president, vice-president and sole shareholders. Van Zandt also executed a Credit Agreement granting a security interest to Purina in certain cattle to be purchased, fed and conditioned by Van Zandt with the loan proceeds. The cattle were to be placed in a cattle ownership program administered by Purina. Purina filed a financing statement to perfect its security interest in these cattle.

Between December 30, 1997 and March 7, 1998, Purina advanced the aggregate principal amount of $272,537.40 to Van Zandt to purchase 818 head of cattle. According to Purina, among these 818 head were 125 of the Grishams own cattle which they sold to Van Zandt for $29,571.28 on December 20, 1997. Van Zandt issued a check dated December 20, 1997 for this amount to "J & K # 1." On December 22, 1997, the Grishams endorsed this check to the Bank as a payment on the Grishams' note with the Bank. The Bank issued a receipt to the Grishams. On the receipt, there was a notation stating "cattle sale to interest per James." With respect to the remaining 693 head (818 minus the 125 allegedly purchased from the Grishams), Purina asserts that Van Zandt purchased all but four head from sellers other than the Grishams at public auction sales.

Thereafter, the Grishams defaulted on their notes with the Bank and with Purina. On April 3, 1998, the Bank obtained a final judgment against the Grishams for $785,097.50 and for foreclosure of the

Bank's security interests in the Grishams' cattle. To prevent the Bank from seizing and selling the 818 head discussed above,[1] Purina filed suit against the Bank and obtained a temporary injunction preventing the Bank from foreclosing on its security interests in these cattle. Subsequently, the trial court ordered that the 818 head be sold by an independent third party and that the proceeds be placed in the registry of the court. On June 1–2, 1998, the cattle were sold and $332,187.76 was deposited by the court into interest-bearing accounts pending final distribution.

After the proceeds had been deposited, Purina filed its Second Amended Petition and Application for Temporary Injunction[2] adding Van Zandt as a defendant and seeking a declaration from the trial court that its interest in all of the deposited funds was superior to the Bank's and Van Zandt's interest. In its answer to Purina's petition, the Bank brought a third-party action against the Grishams and a cross-claim against Van Zandt alleging, essentially, that the Grishams and Van Zandt were "one in the same" and that the Grishams used Van Zandt to perpetuate a fraud upon the Bank when they transferred secured property to Van Zandt. Based on these allegations, the Bank sought a declaration that its rights in the deposited funds were superior to the rights of Van Zandt and the Grishams. The Bank also brought a counterclaim against Purina contending, in essence, that the Bank's interest in the funds was superior to Purina's because the Grishams acted fraudulently by transferring secured property to a wholly owned corporation. By way of its counterclaim against Purina, the Bank sought a declaration that its rights in the deposited funds were superior to those of Purina.

On October 15, 1998, Purina moved for summary judgment on its entire dispute with the Bank, including all counterclaims brought by the Bank against Purina.[3] Purina also moved for summary judgment on all of its claims against Van Zandt. In its motion, Purina argued that the Bank's security interest in the 125 head of cattle discussed above was extinguished under the provisions of the Federal Food Security Act ("FSA") when the Grishams sold these cattle to Van Zandt as a buyer in the ordinary course of business. See 7 U.S.C. § 1631 (West 1988). Moreover, the Bank argued that the loan agreement between the Grishams and the Bank authorized the sale of the 125 head to Van Zandt thereby extinguishing the Bank's interest in these cattle. With regard to the four head purchased by Van Zandt from the Grishams at public auction sales, Purina asserted that the Bank's interest in these cattle was also invalidated by the FSA. Furthermore, Purina contended that it possessed the superior right to the remaining 689 cattle since the Grishams never owned these animals. Thus, Purina argued that the security interest of the Bank did not attach to these cattle. Finally, concerning the

---

1. Although the record before us is somewhat unclear, it appears that the Bank was able to successfully seize and sell some of the of the Grisham cattle in partial satisfaction of the Bank's judgment. As Purina points out, these cattle were not collateral securing Purina's note and were never made a part of this case.

2. This application for temporary injunction sought to enjoin the Bank and/or Van Zandt from disposing of the deposited funds without

a final judgment of the trial court determining the relative rights of the parties in these funds.

3. Purina and the Bank dispute whether Purina's motion as to the Bank's counterclaim proceeded under Tex.R. Civ. P. 166a(c) (movant has the burden of establishing its entitlement to judgment as a matter of law) or 166a(i) ("no evidence" motion).

Bank's counterclaim, Purina argued that there was "no evidence to suggest fraud relating to the purchase . . . of the Cattle" and that there was "no evidence to suggest that [Purina] participated in a scheme to defraud anyone." At a hearing on November 12, 1998, the trial court granted Purina's motion. Eventually, the trial court ordered that all claims by or against Purina be severed out of the original cause and be made the subject of a separate suit. The trial court then proceeded to enter its Final Summary Judgment in the severed cause in favor of Purina on December 10, 1998. At the time the judgment was entered, the proceeds from the sale of the cattle totaled $335,451.83 with accumulated interest. In its Final Summary Judgment, the trial court awarded $322,450.72 of the deposited funds to Purina and the remainder ($13,001.11) to Van Zandt. The trial court further ordered that, except for the award of the deposited funds, Purina take nothing by its suit against the Bank and Van Zandt and that the Bank take nothing by its suit against Purina. From this Final Summary Judgment, the Bank brought this appeal.

## II.

### STANDARD OF REVIEW

Under Tex.R. Civ. P. 166a(c), summary judgment is proper only when the movant demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex.1985); Tex.R. Civ. P. 166a(c). When deciding whether there is a disputed material fact issue precluding summary judgment under Rule 166a(c), we treat evidence favorable to the nonmovant as true and we resolve any doubts in its favor. *Id.* As the plaintiff-movant in the trial court, Purina was required to establish, as a matter of law, each element

necessary to show its superior right to the deposited funds. *See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972); Tex.R. Civ. P. 166a cmt. to 1997 change. If Purina's motion as to the Bank's counterclaim proceeded under Tex.R. Civ. P. 166a(c), Purina, as the defendant-movant, was required to disprove at least one essential element of the Bank's counterclaim as a matter of law. *See Schafer v. Federal Serv. Corp.,* 875 S.W.2d 455, 456 (Tex.App.—Houston [1st Dist.] 1994, no writ). If Purina's motion as to the Bank's counterclaim proceeded under Tex.R. Civ. P. 166a(i), Purina was required to specify the elements of the claim it was challenging. Tex.R. Civ. P. 166a cmt. to 1997 change. If Purina did so, the trial court was required to grant the motion unless the Bank produced summary judgment evidence raising a genuine issue of material fact. Tex.R. Civ. P. 166a(i).

## III.

### THE 125 HEAD OF CATTLE

In issue three, the Bank contends that the trial court erred in granting summary judgment for Purina because material fact issues exist regarding the Grishams' alleged sale of 125 head of the Bank's collateral to Van Zandt. In the trial court, Purina did not dispute the Grishams' ownership of the 125 head and that the Bank had a security interest in these cattle prior to the sale to Van Zandt. As discussed above, Purina argued in its motion for summary judgment that (1) the sale of the cattle to Van Zandt cut off the Bank's security interest under the FSA and/or (2) the loan agreement between the Bank and the Grishams authorized the sale of the cattle to Van Zandt thereby extinguishing the Bank's lien on the cattle. We will address each of these bases for summary judgment in turn.

## A. Food Security Act

■ The Supreme Court of Nebraska has set forth the circumstances surrounding the passage of the Food Security Act.

Prior to the federal 1985 farm bill, commonly known as the FSA, buyers of farm products in the ordinary course of business did not take free of a security interest in such products. This rule has commonly been referred to as the "farm products rule" of the U.C.C. [Tex. Bus. & Com.Code Ann. § 9.307(a) (Vernon 1991)] and has acted as an exception to the general article 9 rule that a buyer in the ordinary course of business would take free of a security interest even if the buyer knew of its existence. Under the farm products rule, a secured lender who did not authorize the sale of collateral could sue the buyer in conversion when the debtor sold farm products and did not repay the lender. The consequence of this was that the buyer could be forced to pay for the products twice, once when they were purchased, and again to the secured party.

*Battle Creek State Bank v. Preusker*, 253 Neb. 502, 571 N.W.2d 294, 298 (1997). Because of widespread criticism of the farm products rule, Congress passed the FSA, which preempted operation of the farm products rule. *See Nelson v. American Nat'l Bank of Gonzales*, 921 S.W.2d 411, 416 (Tex.App.—Corpus Christi 1996, no writ); *Food Services of America v. Royal Heights, Inc.*, 123 Wash.2d 779, 871 P.2d 590, 594 (1994). The FSA provides in relevant part:

(d) **Purchases free of security interest**

Except as provided in subsection (e) of this section and notwithstanding any other provision of Federal, State or local law, a buyer who in the ordinary course of business buys a farm product from a seller engaged in farming operations shall take free of a security interest created by the seller, even though the security interest is perfected and the buyer knows of the existence of such interest.

7 U.S.C. § 1631(d) (West 1988). Subsection (e) of the FSA provides that a buyer takes subject to a security interest created by the seller if, within one year before the sale of the farm products,[4] the buyer receives written notice of the security interest from the secured party or the seller.[5] *See* 7 U.S.C. § 1631(e)(1) (West 1988); *Nelson*, 921 S.W.2d at 417.

Purina argues that the Bank failed to deliver to Van Zandt any written notice of its security interest which would comply with the FSA. Purina asserts, therefore, that Van Zandt took free of the Bank's security interest in the cattle as a buyer in the ordinary course of business. Further, Purina contends that the FSA should be interpreted to protect not only a buyer of farm products, such as Van Zandt, but any secured creditor of that buyer as well.

Before it is necessary to address whether FSA protection was implicated, however, it is clear that Purina must establish, as a matter of law, that there was a sale of the 125 head from the Grishams to Van Zandt. Only if there was a sale would the protections set forth in the FSA be applicable. For the reasons discussed below, we hold that Purina has failed to conclusively establish the existence of a sale.

---

**4.** Cattle are farm products under the FSA. *See Nelson*, 921 S.W.2d at 417.

**5.** The FSA also provides a method for states to establish a central filing system to give buyers notice of security interests, 7 U.S.C. § 1631(e)(2), but no such system has been established in Texas. *See Nelson*, 921 S.W.2d at 417.

Purina points to the following evidence in the summary judgment record to establish the occurrence of a sale from the Grishams to Van Zandt:

(1) The check for $29, 571.28.28 issued by Van Zandt to "J & K # 1" on December 20, 1997.

(2) The payment receipt issued by the bank on December 22, 1997 for $29, 571.28.

(3) The notation on the payment receipt stating "cattle sale to interest per James."

(4) Deposition testimony from Karen Grisham, corporate secretary of Van Zandt, that the cattle purchased with the loan proceeds from Purina were bought in the ordinary course of business.

In contrast, the Bank contends that the following evidence, or lack of evidence, creates fact issues as to whether there was a sale of the 125 head:

(1) Affidavit testimony from Ronnie L. Davis, Vice–President and Branch Manager of the Bank, that the Bank never authorized the sale of any cattle securing the Grishams' note with the Bank. Davis specifically testified that the Bank never authorized a sale of cattle from the Grishams to Van Zandt and would not have authorized a sale of the Bank's collateral for that amount. Further, Davis testified that the Bank had no knowledge that the $29, 571.28 payment on December 22, 1997 resulted from the sale of any cattle pledged to the Bank. Finally, Davis testified that he had no knowledge of who wrote the notation on the payment receipt and that it was not written by agents or employees of the Bank.

(2) Karen Grisham's testimony that she did not know for sure if a sale of 125

head from the Grishams to Van Zandt occurred.

(3) Van Zandt allegedly purchased the 125 head from the Grishams for $29,571.28 ($236.57 per head) on December 20, 1997. However, records of Van Zandt's purchases of cattle through public auctions show that on January 17, 1998 it paid $350.00 per head for a group of 33 cattle.

(4) The absence of a bill of sale or written transfer from the Grishams to Van Zandt reflecting the sale of the 125 head.

With regard to the absence of a bill or written transfer, the Bank argues that, under TEX. AGRIC. CODE ANN. § 146.001 (Vernon 1982), a sale of cattle requires a bill of sale or written transfer from the seller to the buyer, and without one, a party's possession of the cattle is presumed to be illegal. In response, Purina contends that any failure to comply with section 146.001 does not invalidate an otherwise "bona fide sale." According to Purina, "[s]o long as the parties intended a sale, the cattle were delivered, and the consideration paid, no bill of sale is necessary to effect a valid sale of cattle."

Purina relies principally upon *Brumley Estate v. Iowa Beef Processors, Inc.*, 704 F.2d 1351 (5th Cir.), *portion of the opinion withdrawn and substituted on rehearing at*, 715 F.2d 996 (5th Cir.1983) to support its position that a bill of sale or written transfer is not required for a valid sale. However, in *Brumley*, it was undisputed that there had been a physical "delivery" of the cattle and, therefore, a "sale" had occurred. *Id.* at 1354, 1360–62; *see* TEX. BUS. & COM.CODE ANN. § 2.106(a) & 2.401 (Vernon 1994). As will be discussed more fully below, although Purina appears to argue that the Grishams "delivered" the cattle to Van Zandt demonstrating that a sale occurred, the record does not support

that contention. Assuming Purina is correct that the absence of a bill of sale or written transfer does not invalidate a sale of cattle, we cannot conclude, on this record, that Purina has presented sufficient evidence of other factors necessary to conclusively establish the existence of a sale.

Section 2.106 (a) of the Uniform Commercial Code ("UCC") provides that a sale "consists of the passing of title from the seller to the buyer for a price." TEX. BUS. & COM.CODE ANN. § 2.106(a) (Vernon 1994). Section 2.401 of the UCC specifies when title passes in various situations:

> (b) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . .
>
> (1) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
>
> (2) if the contract requires delivery at destination, title passes on tender there.
>
> (c) Unless otherwise explicitly agreed where delivery is to be made without moving the goods,
>
> (1) if the seller is to deliver a document of title, title passes at the time when and the place where he delivers such documents; or
>
> (2) if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting.

. . .

TEX. BUS. & COM.CODE ANN. § 2.401 (Vernon 1994). Pursuant to section 2.401, none of the evidence Purina points to in the summary judgment record shows that title to the 125 head passed from the Grishams to Van Zandt. For example, nothing in the record demonstrates that there was any contract or agreement between the Grishams and Van Zandt for the sale of the 125 head. The absence of a contract precludes utilizing the parties' agreement to determine whether a sale, in fact, occurred. *Id.* (b)(2); *see Weisbart & Co. v. First Nat'l Bank of Dalhart, Tex.*, 568 F.2d 391, 394 (5th Cir.1978) (holding that since the contract provided for delivery of cattle at a particular location, a sale did not occur as the cattle were not delivered to agreed upon location). Although title may pass upon delivery of the goods in the absence of an agreement, there is no evidence in the record demonstrating that the 125 head were physically "delivered" to Van Zandt. TEX. BUS. & COM.CODE ANN. § 2.401(b) (Vernon 1994). We grant that there may not be a delivery in the sense of the cattle being physically moved from one location to another since the Grishams were the officers and sole shareholders of Van Zandt. However, subsection (c) of section 2.401 provides that where delivery is made without moving the goods, title passes when documents of title are delivered or at the time of contracting. *See Borg–Warner Acceptance Corp. v. Massey–Ferguson, Inc.*, 713 S.W.2d 351, 353 (Tex.App.—Dallas 1985, writ ref'd n.r.e.) (holding that a sale occurred under section 2.401(c)(2) where the contracts specifically identified the goods by make, model, description, and serial number and no documents of title were to be delivered). Again, there is no evidence of the delivery of any documents of title nor, as indicated earlier, is there any evidence of a contract for the sale of these cattle. Moreover, the evidence referenced by the Bank, particularly the testimony of Ronnie Davis and Karen Grisham, further undermines Puri-

na's attempt to prove the existence of a sale as a matter of law.

Without summary judgment evidence of the passing of title from the Grishams to Van Zandt of some type, we conclude that Purina has failed to conclusively establish the existence of a sale, as that term is defined in the UCC. We also conclude that without conclusive summary judgment proof of the existence of a sale, Purina is not entitled to FSA protection in order to cut off the Bank's security interest in the 125 head as a matter of law. Consequently, Purina is not entitled to summary judgment on this ground.

## B. The Authorization Argument

In order to successfully argue that the Bank authorized the sale of the 125 head in a summary judgment context, Purina must, of course, first conclusively demonstrate the existence of a sale. As discussed above, we hold that the summary judgment evidence presented by Purina fails to establish that a sale from the Grishams to Van Zandt occurred. Accordingly, we conclude that Purina's authorization argument cannot serve as a proper basis for summary judgment. Because neither basis relied upon by Purina for summary judgment as to the 125 head can be upheld, we sustain the Bank's third issue.

## IV.

### THE BANK'S COUNTERCLAIM

■ In issue one, the Bank argues that the trial court erred in granting summary judgment for Purina because Purina failed to negate all of the Bank's claims as a matter of law. In issue two, the Bank asserts that the trial court erred in granting summary judgment in favor of Purina because material fact issues exist regarding the Grishams' fraudulent use of their corporation to defeat the Bank's security interest. As indicated above, the substance of the Bank's counterclaim was that Purina did not have a superior interest in the deposited funds because the Grishams acted fraudulently or illegally by transferring secured property to a wholly owned corporation. This contention formed the basis for the Banks' request for a declaration that its rights in the deposited funds were superior to those of Purina.

Purina argues, in part, that it is entitled to summary judgment on the Bank's counterclaim, because there is no evidence that Purina participated in a fraudulent scheme. We disagree with Purina's contention in this regard because the Bank did not base its counterclaim on Purina's participation in a fraudulent scheme. Instead, the Bank based its claim on the Grishams alleged use of their own corporation to defeat the Bank's security interest in the collateral. In its response to Purina's motion for summary judgment, the Bank contended that the corporate form of Van Zandt should be disregarded because allowing the Grishams to "use the corporate entity ... to bypass the security interest of [the Bank] would be an inequitable and unjust use of a corporate entity."

■ In Texas, "[w]e disregard the corporate fiction, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result.[6]

---

**6.** Purina directs our attention to evidence in the record, such as the fact that Van Zandt and the Grishams had separate offices and separate books, to attempt to demonstrate that Van Zandt was no "sham corporation." Based on *Castleberry*, we cannot conclude that such evidence of "separateness" is necessarily determinative of the Bank's counterclaim.

Specifically, we disregard the corporate fiction:

(1) when the fiction is used as a means of perpetrating a fraud; [and]

. . .

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation."

. . .

 *Castleberry v. Branscum,* 721 S.W.2d 270, 271–72 (Tex.1986). "Because disregarding the corporate fiction is an equitable doctrine, Texas takes a flexible fact specific approach focusing on equity." *Id.* at 273. "The very different bases for disregarding the corporate fiction involve questions of fact. Except in very special circumstances, fact questions should be determined by the jury." *Id.* at 277.

Because we have previously concluded that fact issues exist as to whether a sale of the 125 head actually occurred, we cannot hold that Purina is entitled to judgment as a matter of law on the Bank's counterclaim. Whether Purina's motion for summary judgment on the Bank's counterclaim was a "no-evidence" motion or a motion under Rule 166a(c), we hold that the evidence discussed above raises fact issues as to the existence of fraud or illegality when the Grishams "sold" the 125 head to their wholly owned corporation. For this reason, we sustain issues one and two. In light of our disposition of issues one through three, we need not address the Bank's fourth and fifth issues.

The judgment of the trial court is *reversed* and the cause is *remanded* for further proceedings.