**Mary Kay Byley HARDY, As Executor of the Estate of Willie Bue (Eppes) Byley and Evelyn Byley Thornton, Appellant,**

v.

**Wesley BENNEFIELD, Appellee.**

No. 12–11–00223–CV.

Court of Appeals of Texas, Tyler.

April 18, 2012.

Tom D. Rorie, Kenneth R. Phillips, for Appellant.

Darrin Walker, Wesley E. Hoyt, Jeffrey B. Bates, for Appellee.

Panel consisted of WORTHEN, C.J., GRIFFITH, J., and HOYLE, J.

## *OPINION*

JAMES T. WORTHEN, Chief Justice.

Mary Kay Hardy, as independent executrix of the estate of Willie Bue (Eppes) Byley, and Evelyn Byley Thornton appeal a summary judgment vesting the mineral estate in 184 acres of land in San Augustine County in Wesley Bennefield. Hardy and Thornton raise two issues attacking the summary judgment on appeal. We reverse and remand.

### BACKGROUND

The summary judgment evidence presented to the trial court showed the following facts. Hardy and Thornton's mother, Byley, died testate on March 2, 2002. In her will, Byley left 184 acres of land in San Augustine County to Thornton. However, Byley included in her will a condition that Thornton could not sell the 184 acres within five years of Byley's death unless she obtained an affidavit from Hardy, as independent executrix, that Thornton needed money for a medical emergency.

Hardy and Bennefield were friends who both lived in San Augustine. Bennefield told Hardy he was interested in purchasing the 184 acres because it adjoined his land and he thought he would be able to borrow the money to do so. According to Hardy's deposition testimony, Hardy told Bennefield she was willing to sell him the land but would reserve all minerals. Hardy stated in her deposition testimony that Bennefield understood and agreed to this reservation of minerals.

Hardy and Bennefield approached J. Ken Muckelroy, the owner of San Augustine County Abstract Company, to prepare an unimproved real property contract that Bennefield would need to obtain financing for the purchase. This contract stated "all minerals will be reserved by seller." Both Hardy and Bennefield signed the contract on November 24, 2003. Hardy signed in her capacity as independent executrix of Byley's estate. Both Hardy and Bennefield initialed the page on which the reservation appeared. At the time the contract was signed, Bennefield executed a check payable to Hardy in the amount of $10,000.00. Hardy then immediately issued a $10,000.00 check to Thornton.

Bennefield obtained AgriLand, FLCA financing to purchase the 184 acres. In preparation for closing the sale, Muckelroy, as title insurance agent for Stewart Title Guaranty Company, issued a commitment for title insurance on March 10, 2004. On Schedule "A" of the commitment, he stated that record title appeared to be vested in the "heirs at law of Willie Bue Eppes Byley." On Schedule "C" of the commitment, he identified several requirements that had to be satisfied before an owner's and a mortgagee's policy would issue. Among those requirements were the following:

(j) Execution, Delivery and Recordation of a Warranty Deed with Vendor's Lien

from Mary Kay (Byley) Hardy, as Independent Executrix of the Estate of Willie Bue (Eppes) Byley, Deceased, to Evelyn Byley Thornton conveying the property described on Schedule A herein.

(k) Execution, Delivery and Recordation of an Affidavit from Mary Kay (Byley) Hardy, as Independent Executrix of the Estate of Willie Bue (Eppes) Byley, Deceased, certifying that she has determined that Evelyn Byley Thornton is experiencing a personal medical emergency, as mentioned in Article III, Paragraph A of the Last Will and Testament of Willie Bue (Eppes) Buyley. Therefore, the restriction against Evelyn Byley Thornton selling the property is removed.

(*l*) Execution, Delivery and Recordation of a Warranty Deed with Vendor's Lien from Evelyn Byley Thornton, to Wesley Bennefield, conveying the property described on Schedule A herein and retaining a vendor's lien in favor of AgriLand, FLCA.

(m) Execution, Delivery and Recordation of a Deed of Trust from Wesley Bennefield to Stephen R. Ogletree, Trustee, securing the payment of a note in the original principal amount of $170,661.30, payable to AgriLand, FLCA.

Prior to closing, Muckelroy prepared an affidavit to be signed by Hardy stating that "Thornton is experiencing a personal medical emergency" and therefore, the restriction against her selling the 184 acres is removed. He prepared a deed for Hardy, as independent executrix of Byley's estate, to convey the 184 acres to Thornton, which reserved all oil, gas, and other minerals. Muckelroy also prepared a warranty deed from Thornton to Bennefield that retained a vendor's lien in favor of AgriLand, FLCA. The deed did not contain a mineral reservation. Muckelroy closed the transaction on March 17, 2004, at his abstract company, and these documents were signed and provided to Muckelroy as required on Schedule C of the title policy commitment.

Four and one-half years later, on September 25, 2008, Bennefield filed suit against Hardy, both individually and as independent executrix of Byley's estate, seeking a declaration that he owned the minerals in the 184 acres through the doctrine of after-acquired title. Hardy filed an answer, and Thornton intervened in the suit. Thornton also counterclaimed for reformation of the Bennefield deed due to a mutual mistake of the parties. Bennefield then filed a traditional motion for summary judgment alleging that the mineral estate was vested in Thornton on March 17, 2004, and that her deed of that date transferred her minerals to him. Pursuant to a Rule 11 agreement between Hardy and Bennefield, only Thornton filed a written response to Bennefield's motion for summary judgment. Included in her summary judgment evidence was deposition testimony from Hardy that Bennefield agreed he would be receiving only the surface estate in the 184 acres, and no mineral interest, in the transaction.

In Muckelroy's deposition, which was also included in the summary judgment evidence, he stated he believed he had explained to Bennefield that he would not receive any mineral interest in the 184 acres. He could not specify the wording he used in explaining this to Bennefield, but said that it was his "habit or process" to try to explain fully to a buyer when the buyer was receiving no minerals in a real estate purchase. Muckelroy also testified in his deposition that he believed Bennefield got no mineral interest in the 184 acres from Thornton in her deed to him because Muckelroy had included a mineral

reservation in the deed from Hardy to Thornton. He explained that this was why he put nothing in the deed from Thornton to Bennefield about the mineral estate.

The trial court granted Bennefield's motion for summary judgment and signed an order stating that both the surface and the mineral estate in the real property described in Thornton's March 17, 2004 deed were vested in Bennefield. Hardy and Thornton filed this appeal.

## MUTUAL MISTAKE

In their first issue, Hardy and Thornton contend that the traditional summary judgment was granted in error because there was evidence of a mutual mistake. In their second issue, they contend that the summary judgment evidence raised a fact issue as to each element of the affirmative defense of mutual mistake warranting reformation of the Bennefield deed. We will address both of these issues together.

### Standard of Review

■ Hardy and Thornton assert the affirmative defense of mutual mistake. To remedy the mutual mistake, Hardy and Thornton seek reformation of the deed, which is a form of equitable relief that was asserted here as an affirmative counterclaim. Reformation is unavailable unless the party claiming mutual mistake presents "clear, exact and satisfactory evidence." *Estes v. Republic Nat'l Bank of Dallas*, 462 S.W.2d 273, 275 (Tex.1970).

Although Hardy and Thornton's burden at trial is proof by clear and convincing evidence, we do not apply a heightened standard in our review of the summary judgment. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 421–23 (Tex. 2000). When viewed narrowly, the express holding in *Huckabee* applies only to defamation cases. *See id.* However, the Texas Supreme Court impliedly signaled

that when a heightened standard of proof is required at trial, we nevertheless ordinarily apply the traditional standard when reviewing an order granting summary judgment. *See id.* Specifically, the court stated as follows:

One consideration is the difficulty in adapting review under a heightened evidentiary standard to Texas summary judgment practice. Requiring the trial court to determine at the summary judgment stage whether a reasonable juror could find the evidence to be clear and convincing suggests that the trial court must weigh the evidence. Texas law has always emphasized that trial courts must not weigh the evidence at the summary judgment stage. Instead, a trial court's only duty at the summary judgment stage is to determine if a material question of fact exists. Unless constitutionally mandated, we see no reason to upset this traditional demarcation between fact-finder and judge by requiring trial courts to weigh the evidence at the summary judgment stage.

We are reminded that the majority in *Anderson* [*v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ] insisted that its standard did not require trial courts to weigh evidence at the summary judgment stage.

. . . .

Several commentators have agreed that trial judges cannot determine the "caliber and quantity" of evidence without performing some of the functions of a finder of fact.

Furthermore, the clear-and-convincing standard provides little guidance regarding what evidence is sufficient for a plaintiff to avoid summary judgment. We have defined clear and convincing evidence as "that measure or degree of proof which will produce in the mind of

the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Clearly, this standard is vague. Accordingly, we have been reluctant to require it except in those "extraordinary circumstances" when that degree of proof is mandated by constitutional or statutory requirements. On a cold summary judgment record, without having observed a single witness, it would take keen insight to forecast accurately whether probative evidence would or would not produce a "firm belief or conviction" in the mind of the trier of fact. The distinction, in a paper record, between evidence that will merely raise a fact issue and evidence that will be clear and convincing is generally subtle, if not wholly subjective.

Because of the difficulty faced by a trial judge in applying the clear-and-convincing standard at the summary judgment stage, Justice Rehnquist predicted that *Anderson* would "cause the decisions of trial judges on summary judgment motions in libel cases to be more erratic and inconsistent than before." Although we cannot empirically determine whether this prediction has in fact come to pass, we see no reason to risk such an outcome by departing from our traditional summary judgment standard. . . .

*Id.* (Internal citations omitted). Bennefield brought forth no evidence indicating that the situation we face in the instant case is one of those extraordinary circumstances where the degree of proof is mandated by constitutional requirements. Therefore, we apply the traditional summary judgment standard of review.

██ We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Ag. v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex.2007). The movant for traditional summary judg-

ment has the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). For a plaintiff to prevail on a motion for summary judgment when, as here, the defendants have asserted a counterclaim, the plaintiff must prove, as a matter of law, each element of his cause of action and show he is entitled to summary judgment on the counterclaim. *See Tello v. Bank One, N.A.*, 218 S.W.3d 109, 113 (Tex.App.-Houston [14th Dist.] 2007, no pet.) (citing *First State Bank of Athens, Mabank Branch v. Purina AG Capitol Corp.*, 113 S.W.3d 1, 4 (Tex.App.-Tyler 1999, no pet.)). A plaintiff asserting a traditional motion for summary judgment in opposition to a defendant's counterclaim must disprove at least one essential element of the counterclaim as a matter of law. *Id.* at 113–14 (citing TEX.R. CIV. P. 166a(c); *First State Bank*, 113 S.W.3d at 4). Once the movant has established a right to summary judgment, the burden of proof shifts to the nonmovants to respond to the motion and present to the trial court any issues that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979).

██ Additionally, if, as here, the nonmovants rely on an affirmative defense to oppose the summary judgment motion, they must provide sufficient summary judgment evidence to create a fact issue on each element of the defense. *See Tello*, 218 S.W.3d at 114 (citing *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex.1984)). The nonmovants are not required to prove the affirmative defense as a matter of law; raising a fact issue is sufficient to defeat summary judgment. See *id.* (citing *Brownlee*, 665 S.W.2d at 112).

■ Evidence favorable to the non-movants will be taken as true in deciding whether there is a disputed material fact issue precluding summary judgment. *Nixon,* 690 S.W.2d at 548–49. Moreover, we examine the entire record in the light most favorable to the nonmovants, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006) (per curiam); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). An appellate court reviewing a summary judgment must consider whether reasonable and fair minded jurors could differ in their conclusions in light of all of the evidence presented. *Goodyear Tire & Rubber Co. v. Mayes,* 236 S.W.3d 754, 755 (Tex.2007).

### Applicable Law

■ A party is entitled to reformation of a deed when it proves that it reached an agreement with the other party but the deed does not reflect the true agreement due to a mutual mistake. *Gail v. Berry,* 343 S.W.3d 520, 524 (Tex.App.-Eastland 2011, pet. denied). Mutual mistake is an affirmative defense that must be pleaded and proved. *Garza v. Villarreal,* 345 S.W.3d 473, 483 (Tex.App.-San Antonio 2011, pet. denied). A mutual mistake is one common to all parties, wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of a written instrument designed to embody such an agreement. *Id.*

■ Pursuant to the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be avoided. *Williams v. Glash,* 789 S.W.2d 261, 264 (Tex.1990). A material fact is one that involves the subject matter and substance of the contract.

*See de Monet v. PERA,* 877 S.W.2d 352, 357 (Tex.App.-Dallas 1994, no pet.) In order for the defense of mutual mistake to be sustained, there must be fact issues raised to show that all parties to a contract were acting under the same understanding of the same material fact. *Garza,* 345 S.W.3d at 483. A mutual mistake is generally established from all of the facts and circumstances surrounding the parties and execution of the instrument. *Simpson v. Curtis,* 351 S.W.3d 374, 379 (Tex.App.-Tyler 2010, no pet.).

■ Parol evidence is admissible to show that the writing, because of a mutual mistake, incorrectly reflects the true agreement, and that the equitable remedy of reformation is available to correct such a mutual mistake in the written instrument. *Estes,* 462 S.W.2d at 275. The underlying objective of reformation is to correct a mutual mistake made in preparing a written instrument, so that the instrument truly reflects the original agreement of the parties. *Cherokee Water Co. v. Forderhause,* 741 S.W.2d 377, 379 (Tex. 1987). As we have already stated, reformation is unavailable unless the party claiming mutual mistake presents "clear, exact and satisfactory evidence." *Estes,* 462 S.W.2d at 275.

■ When parties mistakenly believe minerals were reserved in an instrument, equity will grant relief by way of reformation if the circumstances otherwise warrant an exercise of its power. *See Miles v. Martin,* 159 Tex. 336, 321 S.W.2d 62, 67 (1959). A person who, because of a mistake of law as to the effect of words used in a conveyance, has transferred to another more than she intended and more than the parties mutually agreed she should do, is entitled to restitution of the excess. *See id.* An instrument based on a mutually mistaken understanding of ownership of a real property interest can be

set aside by a court of equity. *See Furnace v. Furnace,* 783 S.W.2d 682, 686 (Tex. App.-Houston [14th Dist.] 1989, writ dism'd w.o.j.).

### Discussion

Before we consider Hardy and Thornton's first and second issues, we address Bennefield's contention that we should consider the March 17, 2004 deed to him from Thornton in our mutual mistake analysis and nothing else. Hardy and Thornton contend that we should consider the whole transaction beginning with the initial negotiations between Hardy and Bennefield all the way through the closing of the sale of the 184 acres. We agree with Hardy and Thornton. As we have stated, a mutual mistake is generally established from all of the facts and circumstances surrounding the parties and execution of the instrument; therefore we will consider the whole transaction. *See Simpson,* 351 S.W.3d at 379.

### 1. Mineral Reservation

 The party asserting a mutual mistake must show (1) a mistake of fact, (2) held mutually by the parties, (3) which materially effects the agreed upon exchange. *deMonet,* 877 S.W.2d at 357 (citing RESTATEMENT SECOND OF CONTRACTS § 152 (1981)). The express wording of the contract here was that "all minerals will be reserved by seller." Although the real estate sales contract normally merges with the subsequent deed, foreclosing it as evidence in construing the deed, we may consider the contract when analyzing an allegation of a mutual mistake not otherwise evident on the face of the deed. *See Gail,* 343 S.W.3d at 525. Hardy, in her deposition, stated that she told Bennefield he was obtaining no mineral interest in the transaction. Muckelroy likewise testified in his deposition that he told Bennefield he would not acquire any mineral interest.

Muckelroy also testified that he did not intend the mineral estate be a part of the deed that he prepared conveying the 184 acres from Thornton to Bennefield. We hold that Hardy and Thornton's summary judgment evidence raised fact issues as to whether the March 17, 2004 deeds conformed to the intent of the parties as expressed in the initial contract executed on November 24, 2003, as to the ownership or passage of title in the mineral estate of the 184 acres.

### 2. Misconceptions About Ownership

 When a person dies, leaving a lawful will, all of the estate devised or bequeathed by such will, and all powers of appointment granted in such will, shall vest immediately in the devisees or legatees of such estate. TEX. PROB.CODE ANN. § 37 (West 2003); *see also In re Estate of Catlin,* 311 S.W.3d 697, 703 (Tex.App.-Amarillo 2010, pet. denied) (stating that there is no shorter interval of time than when the testator dies and the estate passes to his devisees). Hardy, Thornton, and Bennefield all agreed at oral argument that full title to the 184 acres vested in Thornton upon the death of Byley.

A restraint on alienation of property can be a condition or limitation attached to the transfer of property by deed, lease, or will. 3A ALOYSIUS A. LEOPOLD, TEXAS PRACTICE SERIES: LAND TITLES AND TITLE EXAMINATION § 12.37 (3d ed. 2005); *see also Deviney v. NationsBank,* 993 S.W.2d 443, 448–49 (Tex.App.-Waco 1999, pet. denied). The parties also agreed at oral argument that Hardy never had an interest in the 184 acres. Therefore, the only role of legal significance that Hardy played in this entire transaction was to sign the affidavit stating that Thornton was experiencing a personal medical emergency, and that the restraint against Thornton's capacity to sell the 184 acres within five years of Byley's death was removed.

When Hardy and Bennefield entered into the contract to sell the 184 acre tract, they both thought Hardy had title to the property as the independent executrix of Byley's estate. Bennefield executed a $10,000.00 earnest money check to Hardy at the time he and Hardy signed the contract. He then borrowed $170,661.30 from AgriLand, FLCA to comply with the contract, which was based on a mistaken belief about the ownership of the 184 acre tract. Further, Muckelroy, who prepared both the contract and closing documents, was never in a position to disabuse Hardy, Thornton, or Bennefield of this misconception about ownership of the 184 acres. Muckelroy himself, as evidenced by the commitment for title insurance that he prepared, did not understand that title had vested in Thornton on March 2, 2002, the date of Byley's death. As a result, this entire real estate transaction was rife with misconceptions about who owned the 184 acres from March 2, 2002 through March 17, 2004.

We hold that Hardy and Thornton's summary judgment evidence also created fact issues as to what Hardy, Thornton, and Bennefield believed from March 2, 2002, through March 17, 2004, regarding the ownership of the mineral estate in this 184 acre tract.

### 3. After–Acquired Title

 Bennefield argues that even if he did not obtain the mineral interest on the date of the March 17, 2004 warranty deed, he subsequently acquired the mineral interest through the after-acquired title doctrine when the five year restraint on alienation period was removed pursuant to the terms of Byley's will. Under the af-

ter-acquired title doctrine, "when one conveys land by warranty of title, or in such a manner as to be estopped to dispute the title of his grantee, a title subsequently acquired to that land will pass *eo instante* to his warrantee, binding both the warrantor and his heirs and subsequent purchasers from either." *Houston First American Sav. v. Musick,* 650 S.W.2d 764, 770 (Tex.1983) (citing *Caswell v. Llano Oil Co.,* 120 Tex. 139, 36 S.W.2d 208, 211 (Tex. 1931)). However, the after-acquired title doctrine does not apply to a deed that is subject to reformation due to a mutual mistake of the parties. *See Cornish v. Yarbrough,* 558 S.W.2d 28, 32–33 (Tex.Civ. App.-Waco 1977, no writ). Because we have held that Hardy and Thornton raised fact issues on each element of their mutual mistake affirmative defense, we need not address Bennefield's after-acquired title argument. *See* Tex.R.App. P. 47.1.

### Holding

We have held that Hardy and Thornton's summary judgment evidence created fact issues on each element of their mutual mistake affirmative defense. Accordingly, Hardy and Thornton's first and second issues are sustained.[1]

### Disposition

Having concluded that the summary judgment evidence created fact issues on each of the elements of mutual mistake, we *reverse* the summary judgment entered by the trial court and *remand* this cause for proceedings in accordance with this opinion.

---

1. Bennefield contends the summary judgment should be affirmed as to Hardy because she did not file a response to his motion for summary judgment. Hardy counters that the

Rule 11 agreement between her and Bennefield, which is a part of the appellate record, allowed her to rely on Thornton's summary judgment response. We agree with Hardy.