

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00061-CV

———————————————

CITY OF GAINESVILLE, Appellant

V.

SUZANNE SHARP, Appellee

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV20-00300

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant City of Gainesville files this interlocutory appeal from the trial court's order denying the City's plea to the jurisdiction on Appellee Suzanne Sharp's premises liability claim. The City argues that Sharp did not pay for the use of the City's premises and therefore was a licensee at the time of her accident, that the condition of the premises was not unreasonably dangerous, and that the City did not have actual or constructive knowledge of an unreasonably dangerous condition. Because Sharp has shown that there is a disputed material fact regarding whether the condition was unreasonably dangerous, we affirm the trial court's ruling.

## I. Background

Sharp sued the City for injuries she sustained on the Gainesville airport tarmac. On May 17, 2020, Sharp and her instructor pilot landed their plane at the Gainesville airport to purchase fuel for the plane. Sharp deplaned onto the tarmac with a dog and began walking toward a grassy area. As she was walking the dog, Sharp tripped on an unmarked tie-down[1] protruding from a depression in the ground, which caused her to "fall violently face-first on the pavement." The fall resulted in "serious and disabling injuries requiring surgical intervention," and Sharp brought a premises defect claim against the City under the Texas Tort Claims Act (TTCA). The City then filed a plea to the jurisdiction asserting it was immune from suit because Sharp was a licensee, not

---

[1]For reference, a tie-down is an iron anchor, bolt, or hook embedded in a depression in the concrete that is used to tie down or secure an airplane by its wings, which prevents the plane from being damaged during high winds or a storm.

an invitee, and as a licensee she was unable to prove that the City had actual knowledge of an unreasonably dangerous condition. Sharp responded that by landing at the airport for the sole purpose of purchasing fuel, she paid for the use of the airport and was therefore an invitee. Sharp also argued that regardless of whether she was an invitee or a licensee, the overwhelming evidence established fact issues as to the challenged elements of her TTCA claim, which required the trial court to deny the City's plea. The trial court denied the City's plea, and this appeal followed.

## II. Standard of Review and Applicable Law

Unless the state consents to suit, sovereign immunity deprives a trial court of subject-matter jurisdiction over lawsuits against the state or certain governmental units. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). Cities are political subdivisions of the state and, absent waiver, are similarly entitled to governmental immunity. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex. 2006) (op. on reh'g).

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject-matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). A jurisdictional plea's purpose is to defeat a cause of action without regard to the asserted claims' merits. *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plea may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights ISD v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). The plea to the jurisdiction standard generally mirrors that of a traditional motion for summary judgment under

Texas Rule of Civil Procedure 166a(c). *Miranda*, 133 S.W.3d at 228. Under this standard, the governmental unit must meet the summary judgment standard of proof by successfully asserting and supporting with evidence that the trial court lacks subject-matter jurisdiction. *Id.* The burden then shifts to the plaintiff, who—when the facts underlying the merits and subject-matter jurisdiction are intertwined—must show that there is a disputed material fact regarding the jurisdictional issue. *Id.* (citing *Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000)).

Whether the trial court has subject-matter jurisdiction is a legal question that we review de novo. *Miranda*, 133 S.W.3d at 226. We review a plea to the jurisdiction by considering the pleadings, the factual assertions, and all relevant evidence in the record. *City of Houston v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 575 (Tex. 2018). When reviewing a plea to the jurisdiction that incorporates evidence implicating the merits of the case, we must "take as true all evidence favorable to the nonmovant" and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Miranda*, 133 S.W.3d at 228 (citing *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997)). If the evidence creates a fact question regarding jurisdiction, the trial court must deny the plea and leave its resolution to the factfinder. *Id.* at 227–28. But if the evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea as a matter of law. *Id.* at 228.

### III. Discussion

The TTCA provides a limited waiver of governmental immunity for personal injury claims arising from premises defects. Tex. Civ. Prac. & Rem. Code Ann. § 101.021; *Miranda*, 133 S.W.3d at 224. Specifically, a governmental unit is liable for personal injury caused by the condition or use of real property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann. § 101.021. For such claims, "the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises." *Id.* § 101.022(a). If the claimant paid for the use of the premises, she is an invitee. *City of Fort Worth v. Posey*, 593 S.W.3d 924, 927 (Tex. App.—Fort Worth 2020, no pet.) (citing *Sullivan v. City of Fort Worth*, No. 02-10-00223-CV, 2011 WL 1902018, at *8 (Tex. App.—Fort Worth May 19, 2011, pet. denied) (mem. op. on reh'g)).

Here, the elements of Sharp's cause of action depend on whether she was a licensee or an invitee at the time of her accident. *See id.* If Sharp was a licensee, she must show that the City had actual knowledge of the unreasonable risk of harm created by the tie-down. *Id.* If she was an invitee, Sharp need only show that the City knew or should have known of the unreasonable risk of harm—i.e., constructive knowledge. *See id.*

5

## A. Sharp's Status as Invitee or Licensee

The City first disputes whether Sharp paid for the use of the airport premises, arguing that Sharp was a licensee at the time of her accident. Sharp contends that she paid for the use of the premises because she and her instructor pilot landed their plane at the City's airport for the sole purpose of purchasing fuel, and accordingly, she was an invitee. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a).

To support her contention, Sharp cites our decision in *Posey*. In that case, the claimant, Posey, attended an event hosted at a venue owned by the City of Fort Worth. *Posey*, 593 S.W.3d at 927. Posey paid a fee to park at the venue and another fee to attend the event within. *Id.* As she exited the venue, Posey tripped over an obstruction on the sidewalk between the venue and the parking lot and injured herself. *Id.* She then brought a premises liability claim against the City of Fort Worth, which filed a plea to the jurisdiction asserting immunity. *Id.* On appeal, the City of Fort Worth argued that Posey was a licensee because the sidewalk where she fell was open to the public generally, and payment was not required to access it. *Id.* at 928. We rejected this argument, holding that "a person is entitled to invitee status if the person paid to use the premises, regardless of whether other members of the public might also be present without paying." *Id.* at 929. "An invitee is one who enters the property of another with the owner's knowledge and for the mutual benefit of both." *Id.* (citing *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 202 (Tex. 2015)).

6

Sharp argues that, like Posey, she landed at the City's airport for the mutual benefit of both parties—her need for fuel and the City's sale of fuel. Because she landed at the City's airport for a purpose connected with the business in which the airport is engaged—selling fuel—Sharp argues she went to the airport under an implied invitation and therefore was an invitee. *See id.*

The City responds that *Posey* is distinguishable because, unlike Sharp's landing at the City's airport, Posey paid to park her vehicle in the parking lot and then paid to enter the venue. *See id.* at 930. The City did not charge landing fees or tie-down fees at their airport. Comparatively, the City suggests that a landing fee would have been like Posey's payment to enter the City of Fort Worth's venue, and a tie-down fee would have been like Posey's payment to park at the venue. But Sharp did not pay a landing fee or tie-down fee or even a fee to enter the City's airport premises; rather, she and her instructor pilot landed at the airport and merely purchased fuel with a credit card. Consequently, the City asserts that *Posey* would support Sharp's contention only if Posey had not paid to park and to enter the City of Fort Worth's venue, and instead, she had merely purchased a gift inside the venue.

The City further analogizes Sharp's claim to invitee status to a person that enters a courthouse and purchases a soda from a vending machine inside the courthouse. The person's purchase of the soda does not constitute payment for use of the courthouse, and therefore, it does not make the person an invitee. Because Sharp

7

did not pay for the use of the airport premises, the City contends that Sharp was a licensee at the time of her accident.

The plain language of Section 101.022(a) supports the City's argument. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a); *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998) (looking to the plain and common meaning of the statute's words). To obtain the status of invitee, the TTCA explicitly states that the claimant must pay "for the use of the premises." Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a); *see also Posey*, 593 S.W.3d at 929 ("The text of the statute makes a person's status dependent on whether she has paid for use of the premises.").

A fee or payment that is merely related to the premises does not constitute payment for the use of the premises. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a); *City of Houston v. Ayala*, 628 S.W.3d 615, 621 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (concluding that purchasing an airline ticket is not payment for the entry and use of the airport premises); *City of Dallas v. Patrick*, 347 S.W.3d 452, 457 (Tex. App.—Dallas 2011, no pet.) (stating that the claimant was an invitee only because she obtained entry to the zoo through her mother's paid zoo membership); *Sullivan*, 2011 WL 1902018, at *8 (finding invitee status only where the payment of a wedding venue's rental fee was tied to entry onto a particular premises); *Clay v. City of Fort Worth*, 90 S.W.3d 414, 417 (Tex. App.—Austin 2002, no pet.) ("Only a fee charged for entry onto a particular premises is sufficient to confer invitee status[.]"); *Simpson v. Harris Cnty.*, 951 S.W.2d 251, 253 (Tex. App.—Houston [14th Dist.] 1997,

8

no writ) (holding that filing fees paid by litigants are not payments for the use of the courthouse premises); *Churchman v. City of Houston*, No. 01-96-00211-CV, 1996 WL 544250, at *2 (Tex. App.—Houston [1st Dist.] Sept. 26, 1996, writ denied) ("If [the claimant] paid for airport parking, she paid for the use of the parking premises, but not the airport terminal premises."); *Garcia v. State*, 817 S.W.2d 741, 743 (Tex. App.—San Antonio 1991, writ denied) (finding that the payment of general licensing fees and fuel taxes does not constitute payment for the use of the public highways of Texas).

Neither Sharp nor her instructor pilot paid a fee for entry onto the airport tarmac. The only payment Sharp made—directly, or indirectly through her instructor pilot—was the payment for fuel. Sharp's payment for fuel was merely related to the premises and did not constitute payment for the use of the City's airport premises. The City's maintenance and operation of its municipal airport is a governmental function. *See City of Corsicana v. Wren*, 317 S.W.2d 516, 521 (Tex. 1958). Indeed, the City's airport is not engaged in the business of selling fuel, and selling fuel is not its primary purpose. In addition to selling fuel, the City's airport facilities offer car rental services, vending machines, catering, 24-hour restrooms, pilots lounge and supplies, conference rooms, and flight planning. The City did not require Sharp to purchase fuel upon landing at its airport or otherwise pay for the use of its premises. Sharp and her instructor pilot could have simply landed their plane, stretched their legs, and taken the dog to use the restroom *without* fueling their plane. Accordingly, purchasing fuel does not constitute payment for the use of the City's airport premises as

9

contemplated by Section 101.022(a). Tex. Civ. Prac. & Rem. Code Ann. § 101.022(a). Because she did not pay for the use of the premises, we hold that Sharp is not entitled to invitee status as a matter of law.

**B. Actual Knowledge of an Unreasonably Dangerous Condition**

Because Sharp was a licensee, the City owed her a duty to protect her from a dangerous condition of which the City had actual knowledge. *See City of Denton v. Paper*, 376 S.W.3d 762, 766 (Tex. 2012); *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010). If the City established with competent evidence that it did not have actual knowledge of an unreasonably dangerous condition, then the burden would shift to Sharp to show there is a disputed material fact as to those jurisdictional elements. *See Paper*, 376 S.W.3d at 766; *Hayes*, 327 S.W.3d at 117.

In its plea and on appeal, the City argues that the evidence establishes that the condition of the tie-down was not unreasonably dangerous and that the City consequently did not have actual knowledge of any alleged dangerous condition. In support of its argument, the City relies on the security-camera video of Sharp's accident, Sharp's deposition, the deposition of the City's airport manager, David Vinton, and photos of the tie-down. The video shows Sharp holding miscellaneous items in her hands, walking from the plane toward a grassy area of the airport facilities with a dog on a leash, and suddenly falling. In her deposition, Sharp testified that she was looking toward the grassy area and had not been looking at her feet when she fell. In Vinton's deposition, he testified that the airport's tarmac and original tie-downs

10

had remained unchanged since the airport opened at the end of World War II and that Sharp had been the only person known to have tripped and fallen over a tie-down hook or claimed to have been injured as a result of the condition of the tarmac. Not one of the thousands of citizens who had previously attended large public events on the airport tarmac was known by the City to have experienced, reported, or observed anything problematic with the tie-downs. Vinton also testified that the City's airport staff had been trained by the Federal Aviation Administration to inspect for and discover potential hazards on the airport tarmac and that they had inspected the airport daily. Further, Vinton testified that there are no mandatory federal, state, county, or city requirements for marking the tie-downs at the City's airport, and the airport's tie-downs in fact complied with the FAA's recommended guidelines.

In her response to the City's plea, Sharp argued that the overwhelming evidence established fact issues as to the City's actual knowledge of the unreasonably dangerous condition of the tie-down. In support of her argument, Sharp's evidence consisted of the parties' written discovery, the depositions of Sharp and Vinton, photos of the tie-down, Google Maps photos of the City's airport, and the City's incident report following Sharp's accident. Vinton testified that the City was aware of the existence of the unmarked tie-down prior to Sharp's accident. The photos of the tie-down show that it was unmarked at the time of Sharp's accident, that it blended in with the tarmac, and that it was not readily distinguishable from the surrounding tarmac surface or visibly apparent. The Google Maps photos show that there are

11

other tie-downs at the airport marked with a yellow "T" shape. Vinton testified that these other tie-downs were painted in the "T" shape "[p]er Federal regulations" and to direct aircraft how to approach the tie-down area. But when questioned why some tie-downs had not been similarly marked, Vinton testified that the City had not "found a need" to mark all the airport's tie-downs. Sharp also pointed to Vinton's testimony that the City had marked other areas of the airport that the City had determined to be trip hazards, including a curb at the airport's terminal and a curb at the airport's fuel island. Additionally, the City's incident report explains that Sharp "caught her foot in one of the 'tie-down' hooks that [was] cemented in, in a depression." Vinton explained, in his "professional opinion," that Sharp did not see the in-ground tie-down depression and, as a result, fell. Notably, the report reflects that the accident was not investigated.

While the question of whether a specific condition is unreasonably dangerous is ordinarily a fact question, some "particularly innocuous or commonplace hazards are not unreasonably dangerous as a matter of law." *United Supermarkets, LLC v. McIntire*, 646 S.W.3d 800, 802 (Tex. 2022); *see also Scott & White Mem'l Hosp. v. Fair*, 310 S.W.3d 411, 415 (Tex. 2010) (holding that a patch of ice on the road causing a patron to slip and fall was not unreasonably dangerous as a matter of law); *Brinson Ford, Inc. v. Alger*, 228 S.W.3d 161, 163 (Tex. 2007) (holding that a pedestrian ramp did not pose an unreasonable risk of harm as a matter of law); *Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 408–09 (Tex. 2006) (holding that the wet floor in front of a self-serve

12

soft-drink dispenser was not unreasonably dangerous as a matter of law); *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 676 (Tex. 2004) (holding that naturally accumulating mud was not unreasonably dangerous as a matter of law).

In a recent opinion, the Supreme Court of Texas analyzed when a specific condition may be unreasonably dangerous. *See McIntire*, 646 S.W.3d at 803.[2] "A condition is unreasonably dangerous if 'there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it[,] or some similar event[,] as likely to happen.'" *Id.* (quoting *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 754 (Tex. 1970)). To determine what constitutes an unreasonably dangerous condition, a court must consider the following factors: "whether the relevant condition was clearly marked, its size, whether it had previously caused injuries or generated complaints, whether it substantially differed from conditions in the same class of objects, and whether it was naturally occurring." *Id.* at 803 (citing *Brinson Ford*, 228 S.W.3d at 163; *Brookshire Grocery Co.*, 222 S.W.3d at 408; *M.O. Dental Lab*, 139 S.W.3d at 675–76; and *Seideneck*, 451 S.W.2d at 754). Here, based on the

---

[2]The *McIntire* opinion was released after this court heard oral arguments in the present case. *See id.* In that case, a customer sued a grocery store after she sustained serious injuries from tripping over an approximately 3/4-inch divot in the grocery store's parking lot. *Id.* at 801. The court held that the divot was not unreasonably dangerous as a matter of law, emphasizing that "in so holding, [the court] make[s] no broad pronouncements on whether pavement defects constitute unreasonably dangerous conditions, and [the court does] not opine on whether another larger or differentially situated defect could pose an unreasonable risk of harm." *Id.* at 805. Because *McIntire* is distinguishable, we do not reach the same conclusion.

factors from *McIntire*, we cannot say that the condition of the tie-down was not unreasonably dangerous as a matter of law.

Regarding whether the condition was clearly marked, it is undisputed that the tie-down was not marked at the time of Sharp's accident.

As for the size of the tie-down and the depression in which it was cemented, Vinton testified that the tie-down opening was at least one-and-a-half inches, and it was elevated less than an inch above the ground. Sharp asserts, based on the photos she submitted with her response, that the depression is ten to twelve inches long and about four inches wide, which is large enough for a person wearing shoes to step their foot into, as Sharp did. And the City confirmed that Sharp caught her foot in the tie-down. In contrast, the "profoundly ordinary" divot in *McIntire* measured only 3/4 of an inch deep, and unlike here, that divot did not encompass a partially buried, metal tie-down hook that protruded from the ground. *See* 646 S.W.3d at 803.

That the tie-down had not previously caused injuries or generated complaints does not establish as a matter of law that the tie-down was not unreasonably dangerous. "Although such evidence would be probative, it is not required." *Pitts v. Winkler Cnty.*, 351 S.W.3d 564, 573–74 (Tex. App.—El Paso 2011, no pet.) (citing *Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 645 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). Vinton testified that the City was not aware of anyone else ever falling on the airport tarmac. But Vinton also conceded to the possibility that someone could have tripped and simply not notified the City.

14

Regarding whether the tie-down substantially differed from conditions in the same class of objects, there were several tie-downs throughout the airport tarmac like the one Sharp tripped over. However, unlike other tie-downs at the airport, this specific tie-down was not marked with a yellow "T."

Lastly, regarding whether it was naturally occurring, there is no dispute that the condition of the tie-down did not naturally occur. Vinton testified that the United States government seized the land and built the airport during World War II to quickly train pilots. The airport tarmac, including the tie-downs, was originally built by the U.S. government as part of its airfield operation.[3] In contrast, the parking lot divot in *McIntire* was a "[t]iny surface defect[] in pavement" that was "ubiquitous and naturally occurring." 646 S.W.3d at 803. The supreme court compared the 3/4-inch

---

[3]These facts are nearly identical to the facts of a federal New York case. *See Venturella v. United States*, No. 83-CIV-2585, 1987 WL 15259 (E.D.N.Y. July 27, 1987). In that case, Venturella was injured at a United States owned and operated park in New York that had once been an Air Force base. *Id.* at *1. Part of the park had metal tie-down loops implanted into the cement that had been used to hold down airplanes when the area was an airfield. *Id.* While walking back to his parked car, Venturella stepped into a four-inch depression and tripped over one of the metal tie-down loops, causing him to fall. *Id.* Venturella's resulting injuries required surgical intervention, and he sued the U.S. government pursuant to the Federal Tort Claims Act. *Id.* (citing 28 U.S.C. § 1346(b)(1)).

Witness testimony established that the area of the park with the tie-downs was not restricted to parking, the tie-downs were not marked, and there were no signs warning guests to watch their step. *Id.* at *3. The district court concluded that the government knew of the existence of the tie-downs and took no steps to protect potential guests from the tie-downs' obvious danger. *Id.* at *4. Thus, the court found that under New York law, the omission of adequate warning of the existence of the tie-downs and the improper maintenance of the premises amounted to negligence for which the government was liable to Venturella. *Id.* at *4.

parking lot divot to the accumulation of mud on a man-made surface, "which may occur 'without the assistance or involvement of unnatural contact.'" *Id.* at 803 n.5 (quoting *M.O. Dental Lab*, 139 S.W.3d at 676). The court stated that claimants "will encounter small divots like the one at issue . . . regularly[,] and accidents are 'bound to happen, regardless of the precautions taken by landowners.'" *Id.* Here, the condition of the government-built tie-down was not a tiny surface defect in pavement, it was not "ubiquitous and naturally occurring," and it in fact occurred only as a result of the assistance or involvement of unnatural contact. And ultimately, there exists a fact question regarding whether, had the City taken precaution, Sharp's accident would not have been "bound to happen." *See id.*

Nothing in the *McIntire* opinion suggests that all factors must be established in favor of the claimant to show that a specific condition is unreasonably dangerous. *See generally* 646 S.W.3d 800. Accepting as true all evidence favorable to Sharp, indulging all inferences in her favor, and resolving all doubts in her favor, we conclude that Sharp has raised a fact issue regarding whether the condition of the tie-down was unreasonably dangerous.

Finally, to prove actual knowledge, Sharp must show that the City had actual knowledge "of the dangerous condition at the time of the accident." *City of Corsicana v. Stewart*, 249 S.W.3d 412, 413 (Tex. 2008). "[T]here is no one test for determining actual knowledge[.]" *Univ. of Tex.–Pan Am. v. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008). While courts may consider whether the landowner has received reports of prior

16

accidents as evidence of actual knowledge, lack of notice of similar accidents does not conclusively negate actual knowledge. *Id.*; *City of Houston v. Crawford*, No. 01-18-00179-CV, 2018 WL 4868306, at *4 (Tex. App.—Houston [1st Dist.] Oct. 9, 2018, no pet.) (mem. op.) (citing *City of Irving v. Seppy*, 301 S.W.3d 435, 444 (Tex. App.—Dallas 2009, no pet.)). Actual knowledge can sometimes be proven through circumstantial evidence when the evidence "either directly or by reasonable inference" supports that conclusion. *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002); *Seppy*, 301 S.W.3d at 444.

The City, as the entity responsible for the operation and maintenance of the airport, knew of the existence of the unmarked tie-down prior to Sharp's accident and had known of its existence since the City first acquired the airport at the end of World War II. The City knew that, although this tie-down was not marked, there were other tie-downs at the airport that had been marked with a yellow "T." The City also knew of the existence of other trip hazards at its airport, acknowledging that they should be painted or marked "to advise folks" of their potential hazard and in fact marking them as such. And the fact that the City had not received reports of prior accidents does not conclusively negate the City's actual knowledge.

Accepting as true all evidence favorable to Sharp, indulging all inferences in her favor, and resolving all doubts in her favor, we conclude that Sharp has raised a fact issue regarding the City's actual knowledge of an unreasonably dangerous condition.

### III. Conclusion

17

Because Sharp presented sufficient evidence to show there is a disputed material fact regarding whether the condition was unreasonably dangerous, the trial court properly denied the City's plea to the jurisdiction on Sharp's premises defect claim. Accordingly, we affirm the trial court's ruling.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: October 20, 2022